UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

RICKY L. PITTMAN,                                )
                                                 )           Case No. 1:05-CV-00541
            Plaintiff,                           )
                                                 )
      v.                                         )           JUDGE ANN ALDRICH
                                                 )
CUYAHOGA COUNTY DEPARTMENT OF                    )
CHILDREN AND FAMILY SERVICES, et al.             )           <u>MEMORANDUM AND ORDER</u>
                                                 )
            Defendants.                          )
                                                 )
                                                 )

        This is a civil rights case in which plaintiff Ricky L. Pittman ("Pittman") seeks relief under 42

U.S.C. § 1983.  Pittman claims that his constitutional rights were violated during the adjudication of

custody matters involving his son, Najee Waters.  The defendants are the Cuyahoga County Department

of Children and Family Services ("DCFS") and social worker Cynthia Hurry ("Hurry," also known as

Cynthia Keller).  Now before this court is the defendants' motion for summary judgment.  [Doc. No.

29.]  For the following reasons, this court grants this motion in part and dismisses the case against DCFS

with prejudice.  This court denies this motion in part with respect to Hurry.

**I.      BACKGROUND**

        Pittman is the father of Najee Waters ("Najee").  Najee was born on September 7, 2000 to

Pittman and Latarra Waters ("Waters").  Waters was a drug addict who abandoned Najee soon after his

birth.  As a result, DCFS filed a motion in Cuyahoga County Juvenile Court (the "juvenile court") on

January 3, 2001 for the purpose of establishing DCFS as the temporary guardian of Najee.  The motion

erroneously represented that Pittman had not established paternity, was not providing financial

assistance for Najee, and failed to visit Najee regularly.  These erroneous representations were later

corrected in the record.  Nevertheless, the juvenile court granted temporary custody of Najee to DCFS.  The juvenile court held further hearings in March and May of 2001.  On June 12, 2001, the juvenile court granted emergency temporary custody of Najee to DCFS.  These proceedings were attended by Pittman and/or his court-appointed attorney.

At or about the time that the juvenile court granted emergency temporary custody of Najee to DCFS, Hurry met with Pittman and his wife, Bonita, at their home at 3207 Central Avenue, Cleveland, Ohio.  At that meeting, the couple began filling out required DCFS paperwork in anticipation of Najee's possible placement with them.  According to Pittman, Hurry assured him that he was the first in line and that DCFS would seek to make him the custodian of Najee should Waters be found to be an unfit parent.  At that time, Pittman claims that he indicated to Hurry that he and his wife were moving from the Central Avenue address.

On November 16, 2001, Pittman and his counsel attended a juvenile court hearing wherein Najee was adjudicated "neglected."  After November 16, 2001, relying on Hurry's assurance, Pittman ceased attending the juvenile court hearings.  The defendants claim that Pittman stated that he was uninterested in receiving custody, moved to a new home, and refused to provide them with a new address to which notice of future hearings could be sent.  Pittman claims that this is not true.  According to Pittman, he did provide Hurry with his address and the defendants had sufficient information to contact him through other means as well, such as by using the address entered in the state's computer records documenting Pittman's child support payments.

On January 18, 2002, the juvenile court held a dispositional hearing wherein it ordered temporary custody of Najee to DCFS.  In her decision and finding of facts, the magistrate judge found that "[t]he father Ricky Pittman did not show he was interested in receiving custody of his child Najee."

-2-

The juvenile court also scheduled another hearing to be held on June 24, 2002.  Pittman did not attend this hearing, despite having notice.

On February 22, 2002, DCFS filed a motion requesting permanent custody of Najee.  Pittman claims that he was never informed that the motion had been contemplated or filed.

On June 19, 2002, DCFS withdrew its motion requesting permanent custody and requested instead that legal custody be awarded to Martha and Emmitt Graves (the "Graveses"), Najee's maternal great aunt and great uncle.  Shortly thereafter, Hurry filed an affidavit with the juvenile court describing efforts that she had made to locate Pittman.  According to the affidavit, these efforts included"[a]sking father for his new address and he refused to provide it and stated he wants nothing to do with the child."  Pittman claims that this statement is untrue.  A juvenile court hearing was held on June 26, 2002, but Pittman claims that he was not notified of the hearing and did not attend.

On August 21, 2002, the juvenile court conducted a hearing and reset the matter to October 30, 2002 because Pittman had not been properly served.  On October 30, 2002, the juvenile court found that Pittman had been served by publication; all attempts to serve Pittman by mail since September 2001 had been returned from the Central Avenue address without a forwarding address, and personal service in June 2002 was also unsuccessful.  On November 4, 2002, the juvenile court awarded legal custody of Najee to the Graveses.  On January 28, 2003, the juvenile court issued an order terminating DCFS protective supervision, which was not docketed until February 12, 2003.

On November 2, 2003, Waters died.  Upon learning of Waters' death, Pittman sought custody of Najee by filing a motion for modification of custody with the juvenile court.  The juvenile court found that it lacked subject matter jurisdiction because Pittman had filed the motion more than one year after the custody proceedings had concluded.  The Ohio Court of Appeals affirmed the juvenile court's

decision.  Pittman claims that, during the course of the litigation in 2004, he learned that DCFS had

ceased considering him as a possible custodian, contrary to Hurry's earlier alleged assertions.  He filed

the instant action on February 9, 2005.

## II.  STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the initial

burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett,*

477 U.S. 317, 323-25 (1986); *Hedrick v. W. Reserve Care Sys*., 355 F.3d 444, 451 (6th Cir. 2004).  If

the movant succeeds, the burden then shifts to the nonmoving party to demonstrate the existence of a

material dispute as provided in Rule 56(e)(2):

> When a motion for summary judgment is properly made and supported, an opposing
> party may not rely merely on allegations or denials in its own pleading; rather, its
> response must--by affidavits or as otherwise provided in this rule--set out specific facts
> showing a genuine issue for trial.

FED. R. CIV. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  Parties

opposing summary judgment must go beyond the pleadings and produce some type of evidentiary

material in support of their position.  *See Celotex,* 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, this court must view all of the

evidence in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.,* 398 U.S.

144, 157 (1970); *Hamby v. Neel*, 368 F.3d 549, 556 (6th Cir. 2004);  *Williams v. Int'l Paper Co.*, 227

F.3d 706, 710 (6th Cir. 2000).  A fact is "material" only if its resolution will affect the outcome of the

lawsuit.  *Anderson,* 477 U.S. at 248.  An issue is "genuine" if the evidence is such that a reasonable juror

"could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or

whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Id.* at 252.

## III.  DISCUSSION

To state a § 1983 claim, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was deprived, and (2) that the defendant committed the violation while acting under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

The defendants bring at least four different theories in support of their argument that Pittman's § 1983 claims should be dismissed. They argue that (1) Pittman's claims are barred by the statute of limitations, (2) Pittman's complaint fails to establish a due process violation or a fourteenth amendment "liberty" interest claim; (3) Pittman's complaint does not allege an actionable claim against DCFS; and (4) Hurry is entitled to absolute and/or qualified immunity.

### A.    Statute of Limitations

Because 42 U.S.C. § 1983 does not contain its own statute of limitations, courts must look to state law to determine the appropriate limitations period. *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003); *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984). A two-year limitations period applies to civil rights actions under 42 U.S.C. § 1983 in Ohio. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (citing *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989) (en banc)).

Determining when the limitations period begins to run is a question of federal law. *Sharpe*, 319 F.3d at 266; *Sevier*, 742 F.2d at 272. The Sixth Circuit has held that "[t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the injury which is the basis of his action. A plaintiff has reason to know of his injury when he should have discovered it through the exercise of

-5-

reasonable diligence." *Sevier*, 242 F.2d at 273 (citations omitted).  "This inquiry focuses on the harm incurred, rather than the plaintiff's knowledge of the underlying facts which gave rise to the harm." *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991).

Because Pittman filed this case on February 9, 2005, the relevant question is whether, prior to September 9, 2003, Pittman discovered or, by the exercise of reasonable diligence, should have discovered that DCFS has improperly ceased considering him as a custodian for Najee.

Pittman argues that it was not until "mid-2004" that he learned of the basis for his complaint: that, without notice, DCFS had failed to consider awarding him custody of Najee, despite Hurry's representations to the contrary.  Pittman, therefore, argues that the statute of limitations did not begin to run until "mid-2004."  In the alternative, Pittman argues that the statute of limitations began to run on February 12, 2003, which is the date that the juvenile court decision was entered on the docket, thereby terminating protective services and closing the case.  Under either scenario, Pittman's complaint would be timely.  Pittman claims that he did not discover his injury earlier because he relied on statements made by Hurry, who allegedly assured him that he was being considered as the "next in line" for custody should Najee not be reunited with Waters.  At no time, Pittman claims, was he notified that DCFS had ceased considering him as a potential custodian.

The defendants allege that the statute of limitations began to run much earlier.  They claim that the first action concerning the custody of Najee occurred on January 3, 2001, when DCFS filed a motion for temporary custody with the juvenile court.  At the latest, the defendants argue that the statute of limitations began to run on January 28, 2003, when the juvenile court rendered its decision terminating protective services and closing the case.[1]  The defendants claim that Pittman did not discover his alleged

---

[1]The decision, though rendered on January 28, 2003, was not docketed until February 14, 2003.

-6-

injury because he did not exercise reasonable diligence by attending hearings, conferring with his lawyer, or contacting the juvenile court or DCFS.  In her deposition, Hurry stated that Pittman stated that he no longer wanted to receive notices from the court.  [Hurry Depo. 73-74.]  They also argue that his reliance on Hurry's statements was unreasonable.

The issue of whether Pittman should have discovered the facts giving rise to the claim through reasonable diligence "is properly one for the trier of fact, save for the exceptional case when it can be established that there is no material issue of fact."  *Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 n.2 (D.C. Cir. 1971); *see also Mest v. Cabot Corp.*, 449 F.3d 502, 512 (3d Cir. 2006) ("[W]hether a plaintiff has exercised reasonable diligence is generally a factual question reserved for the jury [except when] the facts are so clear that reasonable minds cannot differ as to whether the plaintiffs exercised reasonable diligence"); *Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 719 (7th Cir. 1994) (when a cause of action accrues for statute of limitations purposes is only a question for the court "if the relevant facts are undisputed and only one conclusion can be drawn from them").  Because Pittman and Hurry offer differing accounts concerning the custody process and the representations that Hurry made to Pittman, there are issues of material fact as to when Pittman did, or should have, discovered his injury.

The defendants claim that Ohio law places the duty on a litigating party to inform the court if there is any change in his or her address.  *See Robb v. Smallwood*, 165 Ohio App.3d 385, 389 (2005) ("A party bears the burden of formally notifying the court of a change of address . . . ."); *Nalbach v. Cacioppo*, No. 2001-T-0062, 2002 Ohio App. Lexis 83, at *16 (Jan. 11, 2002) ("Given that informing the trial court of a new address is relatively simple, it follows that the burden of satisfying this requirement cannot be shifted to the opposing party or the trial court.").  Whether the "reasonable

-7-

diligence" standard required Pittman to notify the court of his change of address, when viewed in light of the possible misrepresentations made to Pittman and the juvenile court, is a question better left to a jury.  Summary judgment on the issue of the statute of limitations is, therefore, inappropriate.

**B.      Substantive Due Process**

"There is no doubt that under the constitution, the parent-child relation gives rise to a liberty interest that a parent may not be deprived of absent due process of law." *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006).  "To state a cognizable substantive due process claim, the plaintiff must allege 'conduct intended to injure in some way unjustifiable by any government interest' and that is 'conscience-shocking' in nature." *Eidson v. State of Tennessee Dept. of Children's Servs.*, 510 F.3d 631, 635-36 (6th Cir. 2007) (citations omitted).

Pittman alleges that he was deprived of his right to family integrity when the defendants decided to cut him out of the custody process.  Pittman claims that the defendants have not stated a compelling interest for doing so, such as reasonable suspicion of abuse or neglect by Pittman.  *See, e.g., New York v. Ferber*, 458 U.S. 747, 757 (1982) (stating that "the prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance").

The defendants argue that the decision of the juvenile court to award custody of Najee to the Graveses cannot form the basis of a § 1983 action against the defendants and that this court must give preclusive effect to the state court's judgment with respect to the sufficiency of Pittman's notice.  It appears, however, that the defendants have misinterpreted the alleged deprivation.  Pittman argues that the deprivation occurred when the defendants ceased considering him as a potential custodian, which allegedly occurred long before the juvenile court awarded custody to the Graveses.  Moreover, Pittman

argues that the juvenile court's decision was based, in large part, on false representations made by Hurry about Pittman, his whereabouts, and his interest in seeking custody.

The defendants also argue that Pittman suffered no deprivation at all.  Citing *Walsh v. Erie County Dept. of Job and Family Servs.*, the defendants argue that there is no constitutional deprivation based on a temporary separation of children from their parents.  *See* 240 F.Supp.2d 731, 756-57 (N.D. Ohio 2003).  This court reads the holding in *Walsh* differently.  In *Walsh*, the court did not distinguish between temporary and permanent deprivations, but rather between direct and incidental deprivations. "To recover under § 1983 for deprivation of a protected relationship, a plaintiff must prove that the governmental action was directed toward a protected aspect of that relationship and that any injury was not merely incidental to the action taken."  *Id.* at 757 (citing *Divergilio v. Skiba*, 919 F.Supp. 265, 269 (E.D. Mich. 1996).  Because the defendants' deprivation of a protected relationship in *Walsh* was incidental to their violation of the plaintiffs' Fourth Amendment rights, the plaintiffs did not have a cognizable claim for interference with the parent-child relationship.  *Id.* at 757.  Here, it is clear that the alleged conduct was directed specifically toward disrupting Pittman's family relationship.

The defendants also indirectly argue that the government did have a compelling interest in refusing to consider Pittman for custody because Pittman stated that he was uninterested in receiving custody and refused to comply with the state's procedures, such as providing his new home address or following his case plan.  Pittman disputes these claims.

Genuine issues of material fact exists when the evidence is viewed in a light most favorable to Pittman.  It is unclear whether Pittman and/or the juvenile court were misled by Hurry, whether he was aware of the proceedings in state court, or whether he was uninterested and uncooperative during the process.  Pittman does have a due process right to family integrity, but reasonable jurors could disagree

as to whether the defendants' conduct was unjustifiable or conscious shocking.  These issues of material

fact, therefore, preclude summary judgment on this issue.

### C.    Procedural Due Process

According to the Sixth Circuit:

> To establish a procedural due process claim pursuant to § 1983, plaintiffs must establish three elements: (1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest. *See, e.g., Zinermon v. Burch*, 494 U.S. 113, 125-26, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).  This court has stated that for the purposes of such claims brought under § 1983, "the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate."  *Vicory v. Walton*, 721 F.2d 1062, 1066 (6th Cir.1983).

*Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).  With regard to the adequacy of the pre-

deprivation procedural rights, a party must show that "(1) the state did not have a remedy; (2) the state

had a remedy but it was deemed inadequate; (3) the state had an adequate remedy in form, both

procedurally and in damages, but the state did not apply it or misapplied its remedy." *Haag v. Cuyahoga

County*, 619 F.Supp. 262, 278-79 (N.D.Ohio 1985), aff'd. 798 F.2d 1414 (6th Cir.1986).

Pittman claims that the decision to cut him out of the custody process was made (1) without a

hearing; (2) without his knowledge; and (3) based on false testimony by Hurry.  Consequently, he claims

that his procedural due process rights were violated.  The defendants claim that Pittman was afforded

adequate procedural due process throughout the course of the juvenile court proceedings.  They claim

that he was represented by appointed counsel and had ample opportunity to protest any perceived injury

during the custody proceedings.  Moreover, once the juvenile court awarded custody to the Graveses,

he could have appealed the decision, but he did not do so.

Whether Pittman was afforded due process depends on whether the juvenile court proceedings or an appeal of the juvenile court's decision was an adequate remedy that was not misapplied. If the proceedings were inadequate, if false representations were made to Pittman or to the court, or if Pittman had no notice of the juvenile court proceedings, the juvenile court proceedings, and any appeal therefrom, would have been an inadequate or misapplied remedy and he would have been denied his due process rights. Thus, when the facts are viewed in a light most favorable to Pittman, genuine issues of material fact exist over which reasonable jurors could disagree, precluding summary judgment on this issue.

### D.    County's Liability

The defendants argue that DCFS is not liable under § 1983. Before governmental liability may arise under § 1983, a plaintiff must show (1) that his injury was caused by a constitutional violation, and (2) that the government entity was responsible for that violation. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). The Sixth Circuit has stated:

> "[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Municipal liability must rest on a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff; "[r]espondeat superior or vicarious liability will not attach under § 1983." *Id.* at 385, 109 S.Ct. 1197.

*Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005).

Here, Pittman has pointed to no specific policy or custom that is linked to Hurry's alleged causation of a constitutional injury to Pittman. Pittman has merely made conclusory allegations about DCFS's involvement in the case. For example, Pittman alleges that "there were numerous staffings and meetings of County social work officials at which it was determined that plaintiff was to be cut out of

-11-

the custody process" and "the county has a policy of not giving preference to biological parents over other relatives in custody proceedings" without pointing to any evidence in the record. Because DCFS's liability cannot be based solely upon vicarious liability for Hurry's actions, Pittman's § 1983 claim against DCFS fails.

### E.    Hurry's Immunity

The defendants argue that Hurry is entitled to immunity. In her role as a social worker, the defendants claim that Hurry is entitled to absolute immunity and qualified immunity.

### 1.    Absolute Immunity

The Sixth Circuit has held that in some circumstances social workers are entitled to absolute immunity. *Holloway v. Brush*, 220 F.3d 767, 774 (6th Cir. 2000); *see also Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984); *Salyer v. Patrick*, 874 F.2d 374, 377-78 (6th Cir. 1989). Social workers must be analogized to prosecutors for purposes of determining absolute immunity. *Holloway*, 220 F.3d at 774. The Sixth Circuit has held as follows:

> The analytical key to prosecutorial immunity, therefore, is advocacy–whether the actions in question are those of an advocate. By analogy, social workers are absolutely immune only when they are acting in their capacity as legal advocates– initiating court actions or testifying under oath–not when they are performing administrative, investigative, or other functions. The case before us turns on whether the actions of which [the plaintiff] complains were taken by [the social worker] in her capacity as a legal advocate.

*Id.* at 775 (citations omitted). Pittman has alleged that Hurry made misrepresentations to him and to the juvenile court, which is conduct that would not constitute advocacy. In addition, Pittman argues that Hurry's participation in the decision to not consider Pittman for custody and not advise him of this change also does not constitute advocacy. Because Hurry was not acting in her capacity as a legal advocate–initiating court actions or testifying under oath–she is not entitled to absolute immunity in this case.

-12-

2.      Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from civil suits if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   In determining whether qualified immunity is warranted, a court must ask (1) whether the alleged facts, taken in a light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established in the specific context so that a reasonable official would understand that he is violating that right. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  A court need not address these steps in any particular order, nor must a court address both steps if the defendant makes an insufficient showing on one. *Pearson v. Callahan*, 129 S.Ct. 808, 821 (2009).

In *O'Donnell v. Brown*, a district court in the Sixth Circuit found that, in the context of an alleged illegal removal of children from a home, a social worker who fails to adequately investigate, fails to verify information, and who gives court officials false information is not entitled to qualified immunity:

> Plaintiffs additionally allege that the removal was constitutionally flawed because the CPS Defendants failed to adequately investigate the circumstances leading to the removal, failed to verify critical information before seizing the children, and recklessly gave the referee false information. Viewing these allegations in the light most favorable to Plaintiffs, as the Court must on summary judgment, the removal process may have suffered constitutional defects based on these additional facets of the CPS Defendants' conduct. Accordingly, the CPS Defendants are not entitled to qualified immunity from Plaintiffs' claims stemming from the removal.

335 F.Supp.2d 787, 827-828 (W.D. Mich. 2004).  Here, Pittman had a constitutional right to family integrity.  Moreover, a reasonable person would know that failing to investigate Pittman as a potential custodian, failing to verify important information about Pittman, and making false representations to

-13-

Pittman and to the juvenile court so as to deprive him of custody would constitute violations of Pittman's right to family integrity.  Hurry, therefore, is not entitled to qualified immunity.

## IV.     CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment [Doc. No. 29] is granted in part and denied in part.  Because there are genuine issues of material fact, a ruling on Pittman's substantive and procedural due process claims is inappropriate at this time.  The claims against DCFS are dismissed with prejudice.

Trial will take place on November 9, 2009 at 1:00 PM in Courtroom 17B.

IT IS SO ORDERED.

_/s/ Ann Aldrich_____
ANN ALDRICH
UNITED STATES DISTRICT JUDGE

**Dated: August 17, 2009**